TREAT et al. v. HUBBARD–ELLIOTT COPPER CO. et al.

(Third Division. Valdez. April 6, 1912.)

No. 570.

1. CORPORATIONS (§ 584*)—RIGHTS OF MINORITY STOCKHOLDERS.

Plaintiffs are minority stockholders, owning 14,000 out of a total of 1,500,000 shares in the Hubbard-Elliott Copper Mines Development Company. In their complaint they allege that the trustees and some of the stockholders of the development company organized the Hubbard-Elliott Copper Company, a new corporation, for the purpose of acquiring all the property of the development company. The copper company was authorized to issue 3,500,000 shares of the par value of $1 each, all of which were transferred to the development company in consideration for its whole property. The plaintiffs did not demand their proportion of the shares, but brought suit, after a year's delay, to vacate the sale to the copper company, and require it to reconvey all the property to the development company. On demurrer by defendants, *held*, where minority stockholders, after a year's delay, bring suit to upset a sale of property satisfactory to over 90 per cent. of the stockholders, neither consenting to take stock in the new corporation nor the market value of their interest in the old, they fail to make out a case sufficiently strong in oppression and wrong done them to invoke the court's equity power to the extent asked.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2343–2347; Dec. Dig. § 584.*]

2. CORPORATIONS (§ 584*)—RIGHTS OF MINORITY STOCKHOLDERS—INJUNCTION—DAMAGES.

A dissenting stockholder cannot be compelled to accept shares in the new corporation. He may enjoin the majority from attempting to consolidate without his consent, or, if the consolidation is so effected, he may recover in damages the value of his shares in the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2343–2347; Dec. Dig. § 584.*]

3. CORPORATIONS (§ 572*)—POWERS—REINCORPORATION.

Authority to sell, lease, exchange, and dispose of property cannot fairly be construed to contemplate a reincorporation, a change in the terms by and purpose for which the property is held by the owning corporation, together with enlarged powers given to its agents, nor to contemplate the disposition of all of its property in return for a part thereof. Especially would this be true of a solvent going concern, in no financial difficul-

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

4 A.R.—32

ties nor pressing need of funds to alter or enlarge its business, where the officers and principal stockholders of both companies are the same, and bring it about.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2292; Dec. Dig. § 572.*]

This matter is before the court upon defendants' general demurrer to the complaint, which was filed in this court February 1, 1912, alleging that both the defendant companies were organized under the laws of the state of Washington; that the Hubbard-Elliott Copper Mines Development Company, hereinafter called the development company, was organized in 1904 with a capital stock of 1,500,000 shares of the par value of $1 each; that the Hubbard-Elliott Copper Company, hereinafter called the copper company, was organized in January, 1911, with an authorized capitol stock of 3,500,000 shares of the par value of $1 each; that the plaintiffs are the owners of 14,000 shares, one plaintiff owning his shares since 1904 and the other two plaintiffs owning theirs since 1907; that in July, 1911, the development company owned certain patented mining claims, mill-site claims, unpatented mines, and a railroad tramway survey in the territory of Alaska; that this comprised, with the exception of approximately $75,000 in money and bills receivable, all the property of that company and was of the value of $5,000,000; that said company was engaged exclusively in mining, and was organized for the purpose of owning, developing, and operating the property mentioned and that claimed to be necessary thereto; that it was on January 25, 1911, out of debt, a solvent and going concern; that on that date the development company in form conveyed all of its property by deed or actual delivery to the copper company; that the consideration for such conveyance was the entire capital stock of the copper company, 2,000,000 shares of which were thereafter returned and donated without consideration by the development company to the copper company; that the copper company was organized for the purpose of acquiring said property, which constituted its total assets; that by the conveyance the development company lost all control over its

assets; that it still exists as a corporation, no steps having been taken to dissolve it; that the plaintiffs have at all times objected to said transfer, for which there was no authority in its articles or the laws of the state of Washington, and that it was ultra vires and void; that the copper company was organized by the trustees and a portion of the stockholders of the development company, and has been and is controlled by the trustees and officers of the latter company; that the conveyance has destroyed the value of plaintiffs' stock and is a fraud upon them.

The articles of incorporation set out in the complaint defining the objects and purposes of the development company devote ten paragraphs to the property and rights to be acquired and operated by it. In substance they are: (1) Mines and quarries; (2) smelters and reduction works; (3) timber lands; (4) ditches and flumes; (3) water rights and water power rights; (6) power plants; (7) electric light and power plants; (8) railroads and tram roads; (9) water craft of all kinds and wharves; (10) real estate and town sites.

Each of these paragraphs concludes with a grant of power "to sell, lease, or otherwise dispose of the same," and there is added a separate paragraph as follows:

"To sell, lease, exchange or contract to sell, lease or exchange any property belonging to the corporation, real, personal or mixed."

The objects and purposes of the copper company, as defined in its articles set up in the complaint, are in the main the same as those of the development company, though somewhat more elaborate and in detail. Both companies are to have their principal place of business in Seattle, Wash. The activities of the development company are, however, confined to the state of Washington and the territory of Alaska, whereas the copper company is authorized, not only to transact the same and other business in that state and territory, but in "all parts and places elsewhere wherever it may be desired, without any restriction whatsoever as to place, upon compliance with the laws of such place."

The trustees may keep its books and hold their meetings without the state of Washington. It may "subscribe for, purchase, or otherwise acquire and hold, with the same rights of ownership thereunder as may be permitted to natural persons, the shares, bonds, and obligations of any corporation organized under the laws of any state, territory, district, or colony of the United States or of any foreign country." It may "organize subsidiary corporations." These are powers not in the articles of the development company.

The development company has 5 trustees; the copper company may have 15 and select from themselves an executive committee to exercise all the powers of the full board of trustees. The shares of the capital stock of the copper company are to be issued, fully paid-up, and made absolutely and forever nonassessable for any purpose. Not so with the development company.

The prayer of the complaint is for a decree setting aside the transfer to the copper company, that the copper company be compelled to reconvey all the property received of the development company, and for general equitable relief.

Ostrander & Donohoe, of Valdez, for plaintiffs.
Brown & Lyons, of Valdez, for defendants.

The authorities relied upon by plaintiffs are: L. & N. Ry. Co. v. Commonwealth of Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849; Mason v. Pewabic Min. Co., 133 U. S. 50, 64, 10 Sup. Ct. 224, 33 L. Ed. 524; Hawes v. Oakland, 104 U. S. 450, 26 L. Ed. 827; Dodge v. Woolsey, 18 How. 331, 15 L. Ed. 401; Byrne v. Schuyler Electric Co., 65 Conn. 336, 31 Atl. 833, 28 L. R. A. 304; Botts et al. v. S. & B. C. T. P. Co., 88 Ky. 54, 10 S. W. 134, 2 L. R. A. 594; People of N. Y. v. Ballard, 134 N. Y. 269, 32 N. E. 54, 17 L. R. A. 737, at 746; Ervin v. Oregon R. & N. Co. (C. C.) 27 Fed. 625; Lauman v. L. V. R. R. Co., 30 Pa. 42, 72 Am. Dec. 685; 3 Purdy's Beach on Corporations, §§ 1269 & 1271.

Law and authorities relied upon by defendants are: Dimpfel v. O. & M. R. R. Co., 110 U. S. 209, 3 Sup. Ct. 573, 28 L. Ed. 121; Post v. Beacon V. P. & E. Co., 84 Fed. 371,

28 C. C. A. 431; Savings & Trust Co. v. Bear V Irr. Co. (C. C.) 112 Fed. 693; Pitcher v. Lone Pine S. C. M. Co., 39 Wash. 608, 81 Pac. 1047; Theis v. Spokane Falls G. Co., 49 Wash. 477, 95 Pac. 1074; Traer v. Lucas Pros. Co., 124 Iowa, 107, 99 N. W. 290; Tanner v. Lindell Ry. Co., 180 Mo. 1, 79 S. W. 155, 103 Am. St. Rep. 534; 10 Cyc. 1138; Sess. Laws State of Washington 1905, p. 51, c. 27.

The main questions argued are: (1) May a corporation dispose of all of its property to another corporation, the consideration therefor being the total authorized stock of the new corporation, when the same is done in good faith and in the absence of fraud? (2) After such transfer has been completed, will the court, at suit of minority stockholders in the situation of plaintiffs, set aside all acts of transfer and compel the return of the property?

Owing to the differing views of the courts of the country upon requirements of public policy in the exercise of corporate powers, the varying forms of controlling statutes in the different states, and the great diversity of provisions contained in the charter articles of various corporations, it is of the utmost importance that care be taken in the decisions followed in this field of the law. The safer course is perhaps simply to mark the boundaries by the extreme precedent landmarks, and then keeping within these limits, decide the particular case in the light of the local statutes, decisions, and the contract arising from such law and the articles of incorporation.

Plaintiffs contend that neither the corporate articles nor the Washington statutes authorize the action taken, and that a return of the property should be decreed.

A review of all the authorities cited will not be undertaken. The case of Byrne v. Schuyler Electric Co., 65 Conn. 336, 31 Atl. 833, 28 L. R. A. 304, relied upon by the plaintiffs, was one where the entire property of the corporation was transferred to another company in consideration of shares of stock in the latter; the corporation was a manufacturing and in no sense a trading concern. The sale of the property changed the whole scheme of the corporation and removed the factory to a neigh-

boring town. The complaint alleged that the course taken was ultra vires and prayed for *some* relief. The decision appealed from denied any relief to the minority stockholders. The decision of the appellate court did not order the retransfer or absolutely vacate the sale, but remanded the cause, evidently for some relief, declaring that the company could not fix the compensation to be paid dissenting stockholders. In the course of the opinion the court cites with approval the case of Lauman v. L. V. R. R. Co., 30 Pa. 42, 72 Am. Dec. 685, and quotes extensively from that opinion:

"In that case the defendant company had undertaken to consolidate with another railroad company to transfer all its property to, and take in payment the stock of, the other corporation. The plaintiff was a dissenting stockholder. Judge Lowrie said, 'that the majority of the members of a corporation cannot be authorized to divest the interest of a dissenting stockholder by a transfer of the whole of its property to another company, without first giving security for the interest of such dissenting stockholder.'"

The plaintiffs also rely upon Botts v. S. & E. C. T. P. Co., 88 Ky. 54, 10 S. W. 134, 2 L. R. A. 594. That was a case in which stockholders objecting to corporate consolidation had been denied all relief in the lower court. On appeal it was reversed, and the cause remanded. While pronouncing the consolidation of the two corporations concerned void without the unanimous consent of the stockholders, yet no return of transferred property was decreed.

The case of People v. Ballard, 134 N. Y. 269, 32 N. E. 54, 17 L. R. A. 737, was one where two questions were involved: First, whether an action for the judicial supervision of a business corporation, its officers and members, can be maintained by the Attorney General in the name of the people without a relator; second, whether a corporation created by the laws of one state can be reorganized under the laws of another state without the process of lawful dissolution.

"It cannot sell all its property to a foreign corporation organized through its procurement, with a majority of nonresident trustees, for the express purpose of stepping into its shoes, taking all its assets, and carrying on its business. * * * It was corporate burial in New York for resurrection in California."

In the court's opinion it cites with approval and quotes from Taylor v. Erale, 8 Hun (N. Y.) 1, as follows:

"The sale was not real. It was a mere form to turn a New York corporation into a Vermont one, and thus escape the scrutiny into the affairs of the company permitted by the New York law to the stockholders."

The differing facts show that these decisions should not be controlling in the present case.

The authorities cited by defendants' counsel do not support the extremity of right claimed by them for the majority stockholders of the corporation. The text of 10 Cyc. p. 1138, is not applicable to the present case, for the allegations of the complaint, if true, fairly show that the exigencies of its business did not render the sale necessary; that it was not a dissolution made with a view to paying its debts and closing up its affairs. In Pitcher v. Lone Pine S. C. M. Co., 39 Wash. 608, 81 Pac. 1047, while the opinion declares that where the articles of incorporation recited that the purposes for which this corporation is formed are to work, operate, buy, sell, lease, locate, acquire, procure, hold, and deal in mines, etc., that the trustees had the power to sell all the property of the corporation where ratified by a majority of the stockholders, and that such action was not ultra vires, yet this language must be considered to have been used in the light of the facts of that particular case. In the course of the opinion it is said:

"The Lone Pine Company was deeply in debt. It could not pay its debts except by disposing of these mines; at least no other method is suggested. * * * No other or better plan appears even to have been suggested by appellant or his predecessors in interest, or by any one else. * * * And an assumed action of the board, whether legal or not, becomes binding upon the stockholders when they themselves, by a majority vote, ratify it, assuming, of course, that it be a matter not ultra vires or fraudulent. This is true, to the extent of disposing of all the property of the corporation where necessity so requires."

Traer v. Lucas Pros. Co., 124 Iowa, 107, 99 N. W. 290, was a case in which it was decided that a corporation, whose charter gave it power to sell all of its property and to deal in the stock of other corporations, had a right to sell all of its

property for stock in another corporation. This authority is not controlling in the case at bar, among other reasons, because the charter of the development company did not expressly confer upon it the authority to deal in the stock of other corporations. In Traer v. Lucas P. Co., supra, a part of the consideration for the transfer was money which the court found to have been received by the selling corporation, whose minority stockholder was objecting, and that the same had been paid out for the benefit of that company and its stockholders; that this company had not been able to accomplish the objects of its incorporation until it had received this money. In that case it was sought to set aside the sale of certain mines to the mining company, which sale was made by the prospecting company, which latter company the court found, under its articles—

"had mining rights and property for sale, but no power to mine; hence we think the power to exchange or sell its properties for the stock of a corporation which would engage in the business clearly implied."

In the court's opinion, it distinguishes and quotes from Elyton Land Co. v. Dowdell, 113 Ala. 177, 20 South. 981, 59 Am. St. Rep. 105, but does not disapprove, saying:

"It was said by the court that 'by the sale and transfer of the property the Elyton Land Company divested itself of all its property and capacity to continue the business for which it was organized'; and it was held that such act virtually worked a dissolution of the corporation, and, for that reason and others not necessary to here mention, the sale was ultra vires. There is a well-marked distinction, however, between that case and this. There the business of the corporation was to build, own, and lease houses, etc., and upon the sale of all of its property the corporation was in fact practically dissolved, while here the purpose and business of the Lucas Company was, as its name indicates, to prospect for and own mineral lands, which could be of no value unless they were to be eventually developed and worked by some one; and, as we have heretofore said, the Lucas Company had no such power."

The defendants place great stress upon the authority of Tanner v. Lindell Ry. Co., 180 Mo. 1, 79 S. W. 155, 103 Am. St. Rep. 534. The property sold in that case was a street railway property. Though the people were not a party to the suit,

yet the fact that the public was interested was considered by the court, as will be seen at page 540 of that decision. It was therein conceded that the majority stockholders are not compelled to continue an unprofitable business at the behest of the minority, but the court leaves open the question of the right of the majority to determine for the company and the entire body of stockholders when its business ceases to be profitable and becomes unprofitable.

"The legal proposition which lies at the foundation of the plaintiffs' case is that by the implied contract between themselves, the corporation, and the other stockholders, arising out of the relation of corporation and stockholders, the property of the corporation was to be used to carry on the business for which it was created, and that it was not lawful for the board of directors, without the unanimous consent of the stockholders, to sell all of its property and thereby render it incapable of doing business. The plaintiffs say that such was the law when they invested their money in the stock of the Lindell Railway Company; that they have never consented to a change of the contract in that respect; and that neither the corporation nor the other stockholders nor even the state itself could impair the force of that contract. * * * That is a principle of law founded in justice and is applied to protect the weak against the strong—when the weak is right and the strong is wrong —it is applied to prevent or relieve against an unjust abuse of the power of the majority. It is not an unqualified rule of law. None of the authorities cited say that a sale of all the property of a corporation pursuant to a resolution of a majority of its members is void. They all recognize that the majority in interest have the right to rule within reasonable bounds, and that whilst they have no right arbitrarily or oppressively, to close out a corporation for their own advantage, yet they are not compelled to continue an unprofitable business or to pay the minority more than their stock is worth for the privilege of closing it up. The principle invoked by the plaintiffs is wise and just, but, since it is liable to abuse, its wisdom and justice are seen only in its application to the facts of the given case. It is, as before said, designed for the protection of the minority, but, like some other equitable principles, it is to be used as a shield, not as a sword. When, therefore, the principle is invoked in a court of equity, the case turns on a question of remedy, the court applies the law ex æquo et bono, with due regard to the rights of the plaintiff, and also with due regard to the rights of the defendants and others whose interests may have become involved. Because all the stockholders have not consented to the sale, it does not follow that the sale will be set aside regardless of the consequences. Sometimes when the act is stained with bad faith, and only those who are guilty of the wrong are to be affected, the court will set aside the sale and restore the conditions as they were before. Abbot v. American Hard Rubber Co., 33 Barb. (N. Y.)

589. And sometimes, when the plaintiff is prompt, the court will enjoin the sale. Zabriskie v. Hackensack Ry. Co., 18 N. J. Eq. 178, 90 Am. Dec. 617. But the issuance of an injunction, even when promptly applied for, is always in the sound judicial discretion of the court. 'The courts will require a very strong case for the granting of an injunction which will cause more injury than it will remedy, and it may be said, as a general rule, that an injunction will not be granted when it will be productive of greater injury than will result from a refusal of it. This rule is especially applicable when the party applying for an injunction has by his own laches made it impossible to grant the injunction without inflicting serious injury on the party so to be enjoined. In determining which way the balance of convenience lies, the resultant benefit and detriment to the parties litigant are not the only matters to be considered. The court will also consider the injuries which may be inflicted on strangers to the suit and to the public generally.' 16 Am. & Eng. Ency. of Law (2d Ed.) 363. That doctrine was announced by this court in Bailey v. Culver, 84 Mo. 540. * * * They ask that the sale be set aside and that the Lindell Company be rehabilitated in its former property and set to work under its own charter. This they ask, not upon a showing that any wrong has really been 'done them, not that the transaction was not fair and profitable, not that they were not afforded an opportunity of participation in it to the same extent that was accorded the most favored, but upon the bare naked legal proposition that it is a violation of the implied contract between the stockholders inter sese to sell the property of the corporation so as to disable it from doing business without the consent of all. To concede to the plaintiffs the right to annul the sale under those conditions would be to place the holder of one share of stock in position to dictate to the majority the terms on which a sale might be made, giving him an advantage which reason and justice cannot approve. That is not the law. If, under those circumstances, the sale was a breach of the implied contract, the courts of law are open to the plaintiffs to sue for damages for the injury, but there is nothing in the case to arouse a court of equity into action. * * * It is not necessary, in order to redress the plaintiffs' wrongs, that any such remedy be applied. They are entitled to recover, in a proper proceeding, the value of their stock at the time of its conversion, if they elect to consider it a conversion, or they are entitled, if they so prefer, to have the same proportion of Union Railways stock given to them in exchange for their Lindell stock, etc."

"In the federal courts the rule against ultra vires contracts is upheld in all its rigor and applied with all its severity. The tendency of modern jurisprudence to relax on that subject finds no favor in the federal courts." Cook on Corporations, § 681, p. 2072, and citations.

Yet in the federal courts power is denied a minority stockholder, even of a prosperous corporation, to upset a transfer of

all the corporate property accomplished by the corporation directors and ratified by a majority of the stockholders, but he will rather be afforded relief which, while ample, is yet regardful of the interests of the majority.   This even where the majority have been guilty of constructive fraud.   Ervin v. O. R. & N. Co. (C. C.) 27 Fed. 625; Metcalf v. Amer. School Furn. Co. (C. C.) 122 Fed. 115, at pages 123, 124; Jones v. Mo. Edison Elec. Co., 144 Fed. 765, 75 C. C. A. 631; Wheeler v. Abilene Bank. Bldg. Co., 89 C. C. A. 477, 159 Fed. 391, 16 L. R. A. (N. S.) 892, 14 Ann. Cas. 917; Ryan v. Williams (C. C.) 100 Fed. 172.

The case of Theis v. Spokane Falls G. L. Co., 49 Wash. 477, 95 Pac. 1074, has not been overlooked.   In that case the old company was in need of funds to enlarge its plant, and secured them by organizing a new company, but this court does not agree with the evident interpretation placed by the Washington court upon the case of Symmes v. Union Trust Co. (C. C.) 60 Fed. 830.

Though the complaint alleges a donation by the development company to the copper company of 2,000,000 shares of the latter's capital stock received by the development company in consideration of the transfer of its property to the copper company, yet as the plaintiffs make no allegation of a demand for their proportion of the stock of the copper company, with the allegation that it was refused them, a general charge of fraud without other specification is disregarded.

The court concludes that the allegation of the complaint in substance that the same trustees and officers control both defendant corporations is sufficient to avoid the necessity of a demand upon the development company and its trustees for legal action to the end now sought, prior to the institution of suit by plaintiffs.

The court finds no cited or other authority decreeing a return of transferred property to a corporation, claimed to have been parted with ultra vires, save under controlling facts not disclosed by the present complaint.   The court finds no cited or other authority upholding the right of a majority of the stockholders of a corporation to give the corporate undertaking

another charter, forcing the objecting minority into the new arrangement without relief in case they do not submit, unless there were either facts or controlling charter features involved clearly distinguishing it from the present case.

"An ultra vires or fraudulent act cannot be ratified by the majority, so as to bind the minority; neither can it be ratified by the board of directors. The proper rule is that such a transaction should be approved by a majority in interest of the stockholders, at a meeting called for that purpose, and that even then a court of equity has power to set the transaction aside, at the instance of a dissenting stockholder, if it is unfair and if he is prompt in his application to the court." 3 Cook on Corporations, § 733, p. 2412.

It is believed that this is as far as the courts have gone.

When plaintiffs planting their feet on their contract contend for the right, after one year's delay, to upset a sale which it must be conceded is satisfactory to over 90 per cent. of the stock held, neither consenting to take stock in the new corporation nor the market value of their interest in the old, they fail to make out a case sufficiently strong in oppression and wrong done them to invoke the court's equity power to the extent asked.

Dissenting stockholders cannot be compelled to accept shares in the new corporation. 3 Purdy's Beach on Corp. §§ 1269, 1271, and citations. A dissenting stockholder may enjoin the majority from attempting to consolidate without his consent, or, if the consolidation is so effected, he may recover in damages the value of his shares in the corporation. Id. 1271.

No Washington statute is cited, save the statute of 1905, providing that one corporation may hold stock in another. That statute, passed after the incorporation of the development company, probably would authorize, so far as the state was concerned, the taking over of the stock of the copper company.

"All laws relating to corporations may be altered, amended, or repealed by the Legislature." Article 12, § 1, Constitution of state of Washington.

"All fictitious increase of stock or indebtedness shall be void." Article 12, § 6, Constitution of state of Washington.

Even if the law of 1905, enacted prior to two of the defendants in this action acquiring their stock, provides that one

corporation may hold stock in another, such granted power cannot fairly be held to authorize the virtual reincorporation of a company and acquiring of a new charter by means of the incorporation of the new company procured by the officers and a majority of the stockholders of the old and the transfer of its property to the new.   It does not fairly contemplate holding nothing but stock in another corporation.

Authority to sell, lease, exchange, and dispose of property cannot fairly be construed to contemplate a reincorporation, a change in the terms by and purpose for which the property is held by the owning corporation, together with enlarged powers given to its agents, nor to contemplate the disposition of all of its property in return for a part thereof.   Especially would this be true of a solvent going concern, in no financial difficulty nor pressing need of funds to alter or enlarge its business, where the officers and principal stockholders of both companies are the same, and bring it about.

Doubts as to authority given in the corporation's charter are resolved against the corporation.   L. & N. Ry. Co. v. Commonwealth of Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849.

As above indicated, the plaintiffs are entitled to relief under the allegations of the complaint;  whether they obtain it or not will depend upon the issues yet to be formed and the outcome upon the trial.   The form of that relief will depend, if plaintiffs are successful, to some extent upon their election. If they elect to treat the sale as a conversion of their interest in the development company and its property, it will hereafter have to be determined whether the value of that property and amount of plaintiffs' damage is tried with or without a jury.

The question of whether the delay of plaintiffs in bringing this suit for a year after the transfer constitutes such laches as will bar them from right to a decree for the return of the property it is not now necessary to decide, nor the effect it may have upon other forms of equitable relief.   Laches depends on full knowledge of the facts or means of knowledge, and, laches or no laches, the plaintiffs, in the absence of acquiescence upon their part, still have the right, under the al-

legations of the complaint, to recover the value of their interest in the development company, if they elect to treat the transfer as a conversion of that company's assets.

The demurrer is overruled.